UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Kathy Heisler,

Plaintiff,

v.

Metropolitan Council,

Defendant.

Civil No. 00-2749 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

---

Beth E. Bertelson and David J. Schaibley, Bertelson Law Offices, P.A., Minneapolis, Minnesota, for Plaintiff.

Thomas E. Marshall and Natalie Wyatt-Brown, Jackson, Lewis, Schnitzler & Krupman, Minneapolis, Minnesota, for Defendant.

---

## Introduction

Plaintiff Kathleen Heisler filed suit against her former employer, the Metropolitan Council ("Met Council"), claiming that it violated the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA") by terminating her employment and refusing to make reasonable accommodations for the major depressive disorder from which she suffers. Heisler specifically complains that, although her physicians repeatedly told the Met Council she should not work at night because of her depression, the Met Council would not engage in an informal interactive process with her to find a reasonable accommodation in the form of a position with daytime hours. Rather,



DEC 1 4 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. DEC 1 4 2001
DEPUTY CLERK

Heisler asserts, the Met Council unlawfully forced her to apply competitively for vacant daytime positions, and refused to appoint her to a vacant daytime position that would have constituted a demotion.

Before the Court are the Defendant's Motion for Summary Judgment and the Plaintiff's Motion for Partial Summary Judgment. For the reasons set forth below, the Court will grant the Met Council's Motion and deny Heisler's Motion.

## Background

### I. The Parties

The Met Council operates several public services in the Minneapolis/ Saint Paul metropolitan area. (Marshall Aff. Ex. A at 2 (Veterans Preference Proceeding Decision).) As of 1999, roughly sixty percent of its employees – about 2,400 individuals – worked in the Met Council's Metro Transit Division, the division that operates the public transportation system for the Minneapolis/ Saint Paul metropolitan area. (Id.)

Heisler began working for the Met Council in the Metro Transit Division in 1988. (Id.) For about ten years, Heisler worked evenings as a Fare Collection Supervisor.[1] (Heisler Dep. at 29.) As of 1999, Heisler was one of four Fare Collection Supervisors

[1] A Fare Collection Supervisor oversees the work of "vault pullers." The vault pullers work at the Metro Transit garages, removing fare boxes from every bus when it comes back to the garage after its route and depositing the funds into vaults located at the garage. The buses return to their garages during the evening and through the night. Therefore, the shift for a Fare Collection Supervisor runs from 4:30 p.m. until 2:30 a.m. (See VPP Decision at 4-5.) The vast majority of buses – over eighty percent – return to the garages between 5:00 p.m. and 7:30 p.m. (Heisler Dep. at 189.)

working for the Met Council. As a Fare Collection Supervisor, Heisler was a member of the Transit Manager and Supervisors Association ("TMSA"). (Heisler Dep. at 41.) Throughout the time Heisler worked for the Met Council, she suffered from depression. Her depression reached a critical point in January 1999.

## II. Heisler's Mental Health and Communications with Supervisors in 1999[2]

Heisler was hospitalized as a result of her depression from January 14 to January 20. (VPP Decision at 6.) On January 20, Heisler presented her immediate supervisor, Scott K. Peterson, with a request for family medical ("FMLA") leave. Heisler supported her request with a "Certificate of Health Care Provider" completed by her physician, Khristine E. Klemm, M.D., of Abbott Northwestern Hospital. (Id.) Heisler told Peterson she had been hospitalized for depression and was being discharged into a partial hospitalization program.[3] (Heisler Dep. at 79.) Heisler's request for leave was granted.

On February 12, Heisler presented Peterson with a note from Dr. Klemm stating that she could return to work four days per week, from 4:00 p.m. to 8:00 p.m. (VPP Decision at 6; Heisler Dep. at 91.) Peterson accommodated this limitation on Heisler's hours. Heisler returned to work on the schedule recommended by her doctor and used vacation leave or sick leave to complete her hours so that she could remain a full-time

---

[2] Unless otherwise noted, all dates are in 1999.

[3] A partial hospitalization program involves spending eight hours each day at the hospital for treatment and returning home at night. (Heisler Dep. at 80.)

employee and keep her benefits. (See Heisler Dep. at 92.)

On March 5, Peterson asked Dr. Klemm to provide him with information concerning Heisler's disability status on a form used by the Metro Transit Division. (VPP Decision at 7.) In her response, Dr. Klemm stated that Heisler was suffering from a major depressive disorder and arthritis.[4] (Id.) Dr. Klemm recommended that Heisler be assigned to "day shift work only (full time okay)." (Id.) On March 11, Peterson (who is also a Disability Manager under the Metro Transit Division's disability program) denied Heisler's request to be reassigned to day shift hours. (Heisler Dep. at 106.) Peterson's reason for denying Heisler's request was that an essential function of the Fare Collection Supervisor position is supervising the vault pullers and the vault pulling operation -- since the task of vault pulling cannot be done during the day, when the buses are in operation, supervision of the vault pullers cannot be done during the day. (Id. at 106-07.)

Several times during March, Heisler met with Patricia Calder, a Diversity Specialist in the Met Council's Office of Diversity whose duties include helping employees who are disabled make adjustments or accommodations in order to keep working. Heisler and Calder discussed Heisler's medical restrictions and possible accommodations. Calder spoke with Heisler on March 12, following Peterson's rejection of Heisler's job accommodation suggestion. (Heisler Dep. at 120-21.) In a memorandum

---

[4] At the time the form was filled out, Heisler was experiencing pain in her hands and had been referred to a rheumatologist to determine whether the problem was arthritis. It turned out not to be arthritis. (Heisler Dep. at 99-100.)

Calder prepared to Heisler, Calder reiterated that there appeared to be no way to accommodate her request to work daytime hours as a Fare Collection Supervisor because vault pulling occurred only during the evening and nighttime hours. (Id. at 121.)

On March 12, Dr. Klemm sent Peterson a note stating that Heisler could return to work full time on a day shift beginning March 22. (VPP Decision at 7.) On March 19, Dr. Klemm sent Peterson another note stating that, in her medical opinion, Heisler

> may progress to full time day shift beginning March 22, 1999. Shifts should not exceed 10 hours and should be four days per week (Monday, Wednesday, Thursday, Friday – allowing for medical treatment on Tuesday). She should continue part time work in the interim for the next two weeks until April 2, 1999 to allow her company time to make this accommodation.

(See Heisler Dep. at 137.) On March 25, Peterson met with Heisler and suggested that Dr. Klemm modify her work restriction recommendation by extending the April 2 deadline on working part-time in the evening. (Id. at 140.) On March 26, Dr. Klemm sent Peterson a note extending indefinitely Heisler's clearance to work part-time in the evening.

From March 29 until April 9, Heisler filled a temporary daytime vacancy during the illness of the Supervisor of Central Counting. (VPP Decision at 10.) On March 30, Peterson sent a memorandum to Heisler summarizing what had happened since their last meeting. Peterson indicated that he and Heisler had agreed that Heisler should not continue working the part-time evening schedule for more than thirty days. Thus, April 30 would be Heisler's last shift working from 4:00 p.m. until 8:00 p.m.

On April 17, Heisler and her attorney met with Peterson, Calder, Megan Rounds (an investigator for the Met Council's Human Resources office), Terry Tanberg (Human Resources Manager for the Metro Transit Division), Jan Dietrich (Manager of Diversity in the Met Council's Equal Employment Opportunity Office), and Scott Berg (an officer of the TMSA). (See Heisler Dep. at 155-56.) At this meeting, the participants discussed various work options for Heisler, including light duty work, reassignment, and extending part-time work for Heisler past April 30. Tanberg said that she would look into light duty work and get back to Heisler.[5] (Id. at 156-57.) Dietrich told Heisler that the Met Council did not have a duty to place her in another daytime position as an accommodation to her inability to work at night; Heisler would have to obtain the position through the regular employee selection process.

On several occasions in May and June, Heisler again filled in at the full-time day shift position of Supervisor of Central Counting when that person was either ill or on vacation. When she was not filling in for the Supervisor of Central Counting, she worked a four-hour part-time shift as Fare Collection Supervisor. (Heisler Dep. at 159-61.)

## III. Heisler Applies for Daytime Positions in the Metro Transit Division

In March 1999, Heisler applied for two day-time management positions: Schedule Display Coordinator and Schedule Distribution Coordinator. On April 9, she was told

---

[5] Between May 3 and May 14, Heisler made three phone calls and two office visits to Tanberg to follow up on the light duty issue and received no response.

that she did not meet the qualifications for either position. On or about April 15, the Met Council added Heisler's name to the mailing list so that she would receive the postings for all of the Met Council's job vacancies. (Heisler Dep. at 158.) At about that time, Tanberg also discussed the possibility of Heisler using the Met Council's Learning, Organization and Development service to learn about jobs with the Met Council.

Between April 15 and September 17, the Met Council sent Heisler postings for ninety-five job vacancies; she received forty of these before July 8. (Pl.'s Ex. 7.) The postings included several part-time jobs and several temporary or internship positions. (Id.) The types of positions for which Heisler received postings ranged from "post-doctoral environmental scientist" to "electronics and radio repair technician" to bus cleaner and janitor. (Id.) The Met Council even forwarded to Heisler a posting for a job as a vault puller. (Id.) Heisler applied for four vacancies before July 8, and for two more after that date.[6]

Among the jobs Heisler applied for was that of Associate Transit Operations Analyst. (See Pl.'s Ex. 4 (job posting).) That position was one grade lower than her position as Fare Collection Supervisor. The Met Council interviewed her for the Associate Transit Operations Analyst job on Thursday, May 20. On Friday, May 21, Heisler received a telephone message from Rounds asking what Heisler's salary

[6] Between April 15 and July 8, Heisler applied for the following positions: Associate Transit Operations Analyst, Transit Information Representative, Data Collector, and Manager of Metro Commuter Services.

requirement would be if offered the job.[7] The following Monday, May 24, Heisler returned Rounds' call and said that her salary requirements were negotiable but that she would like to be as close to her current pay as possible. Later in the day, Rounds left another message for Heisler asking her to clarify her disability and limitations. Heisler told Rounds that her only limitations were to work a shift between 6:00 a.m. and 6:00 p.m. and not to exceed forty hours per week.

On Thursday, May 27, Rounds left Heisler a telephone message stating that a decision had been made about the Associate Transit Analyst position which she wanted to discuss with Heisler. When Heisler returned Rounds' call on Friday, May 28, Rounds told her that another candidate had been chosen for the position and that Tanberg wanted to talk to her about it. Heisler saw Tanberg at about 1:00 p.m. that afternoon. Heisler asked why she was not qualified for the position, and Tanberg responded that Heisler was qualified but was not the best qualified. (Heisler Dep. at 174.) Heisler mentioned reassignment under the EEOC Guidelines and Tanberg told her that the Guidelines did not apply and were not enforceable. Tanberg also told Heisler that there would not be any light duty, restricted duty, or alternate duty because Human Resources did not have anyone to administer such a program. On June 2, Heisler met with Tanberg, Rounds and Calder to discuss her options. At this meeting, Heisler was again told that the EEOC

[7] Rounds did not have the authority to hire Heisler. That decision rested with the work unit (e.g., Transportation or Finance) rather than the Human Resources department. (Heisler Dep. at 175.)

Guidelines were not enforceable and did not apply. Tanberg indicated that there was no work available for Heisler to do.[8]

## IV. Heisler's Work Restrictions Change

On June 10, Tracy Ware, M.D., a physician treating Heisler at Park Nicollet Clinic, sent the Met Council a note indicating that Heisler required a one-week FMLA leave of absence beginning June 14.[9] Dr. Ware further stated that, as of June 21, 1999, Heisler would be cleared to work day-shift hours only (between 8:00 a.m. and 5:00 p.m.), and was disabled from working evening and night shifts. (Heisler Dep. at 178-79.) Peterson met with Heisler on June 16 and confirmed that her doctor had revised the restriction on Heisler's work hours such that she was only cleared to work from 8:00 a.m. to 5:00 p.m.

On June 18, Peterson sent a memorandum to a number of Human Resources personnel stating that Heisler could no longer work in the Fare Collection Supervisor position. Peterson reasoned that, if Heisler would be available for only one hour, from 4:00 p.m. to 5:00 p.m., that is not enough time to effectively supervise the vault pullers,

---

[8] The Human Resources department proposed creating an internship position which, on June 7, Heisler indicated she would accept. Heisler learned the next day, however, that the TMSA would not approve the internship because that position was, in essence, an Assistant Transportation Manager. The union believed that the position should pay accordingly and should be represented. (Heisler Dep. at 177-78.)

[9] The note refers to dates in "July," but it is clear from the events that followed that Dr. Ware meant June. (Heisler Dep. at 179-80.)

who come on duty at 4:45. (See Heisler Dep. at 189.)

On June 25, 1999, Heisler spoke to Dietrich about a message she had received from Tanberg advising her that she would be placed on unpaid administrative leave for one week. Heisler was upset that she would have no income as of Monday. Heisler identified to Dietrich three postings for which she would like to apply but felt that she could not because the postings stated that the person hired would need to be available to work on a 24-hour basis. Dietrich documented her conversation with Heisler in a memorandum:

> . . . Kathy said the need to be available for work on a 24 hour basis was not on previous postings and she knows of no Safety Supervisors who work nights. Also preventing her from applying is the fact that she has been told the new person in these positions is scheduled to work nights. Kathy said that could easily be changed to accommodate her, as there is no policy or contract language requiring this type of assignment.
>
> I told Kathy that the agency does not feel they have a legal obligation to accommodate her by changing a long-standing practice of assigning new employees the least desirable shift.

(Pl.'s Ex. 9.)

## V. Heisler is Terminated

On July 8, Heisler met with Peterson, Calder, Rounds, Tanberg, and Berg. At this meeting, Tanberg told Heisler that she was being "disqualified" from the position of Fare Collection Supervisor because she was physically unable to work the hours required for that position. (Heisler Dep. at 201.) Heisler was told that she would still be considered

an "employee," however, for purposes of job postings, which the Met Council sent to her home. (See Heisler Dep. at 207-08.) On July 19, Tanberg sent Heisler a letter notifying her that the Met Council had disqualified her from her position as Fare Collection Supervisor for the reasons discussed at the July 8 meeting. The disqualification effectively discharged her from her employment with the Met Council. (Id. at 3-4.)

Heisler appealed the discharge, requesting a hearing pursuant to the Minnesota Veterans Preference Act ("VPA"), Minn. Stat. § 197.46, and receiving that hearing on October 5, 1999.[10] (Marshall Aff. Ex. A.) The hearing officer decided Heisler's appeal on February 25, 2000, finding that the Met Council acted reasonably in discharging Heisler for being "incompetent" -- that is, physically incapable of doing her job.

Heisler filed an EEOC complaint alleging disability discrimination. On October 31, 2000, the EEOC issued Heisler a Notice of Right to Sue, finding that there was probable cause to believe disability discrimination had occurred.

---

[10] Minn. Stat. § 197.46 provides that

> . . . No person holding a position by appointment or employment in the several counties, cities, towns, school districts and all other political subdivisions in the state, who is a veteran separated from the military service under honorable conditions, shall be removed from such position or employment except for incompetency or misconduct shown after a hearing, upon due notice, upon stated charges, in writing.
>
> Any veteran who has been notified of the intent to discharge the veteran from an appointed position or employment pursuant to this section shall be notified in writing of such intent to discharge and of the veteran's right to request a hearing within 60 days of receipt of the notice of intent to discharge.

## Analysis

### I. Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Any fact alleged to be in dispute must be "outcome determinative under prevailing law"; that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. Rather, the court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v.

Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. See Liberty Lobby, 477 U.S. at 250.

## II. Disability Discrimination

Heisler contends that the Met Council violated the ADA and the MHRA by treating her differently because of a disability and by failing to accommodate that disability.[11] The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, . . . and other terms, conditions and privileges of employment."[12] 42 U.S.C. § 12112(a); accord Minn. Stat. § 363.01(13). To establish a prima facie case of disability discrimination under the ADA, Heisler must show that (1) she has a disability within the meaning of the Act; (2) she is qualified to perform the essential functions of the job in question (either with or

---

[11] Heisler asserts in passing that she was also retaliated against because she inquired about reasonable accommodations. She did not plead a claim of retaliation in her Complaint, however, and makes no separate argument in her briefs, as to the essential elements of a retaliation claim under either the ADA or MHRA, let alone whether there is sufficient evidence to permit such a claim to go to the jury.

[12] Heisler has argued that disability discrimination claims under the MHRA are to be interpreted consistently with claims under the ADA. (Pl.'s Mem. Supp. Mot. for Partial Summ. J. at 9.) That position has been articulated several times by the Eighth Circuit Court of Appeals. E.g., Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001) ("Claims under the MHRA are analyzed the same as claims under the ADA."). The Court, therefore, proceeds with its analysis under the ADA, applying that analysis to Heisler's ADA and MHRA claims.

without accommodation); and (3) she was discriminated against because of her disability. See Webner v. Titan Distrib. Inc., 267 F.3d 828, 834 (8th Cir. 2001); Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001); Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948 (8th Cir. 1999). The term "discriminate," as used in the ADA, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

The Met Council moves for summary judgment on Heisler's claims based upon two main arguments. First, it contends that Heisler is not a "qualified individual with a disability," as defined by the statute. Specifically, the Met Council argues that Heisler's depression does not constitute a "disability," and that she was not "qualified" for either the position from which she was terminated -- Fare Collection Supervisor -- or many of the positions to which she asserts she should have been reassigned as a "reasonable accommodation." Second, the Met Council argues that Heisler cannot establish that it failed to "reasonably accommodate" her depression. The Met Council asserts that it did accommodate Heisler by modifying her work schedule for several months. It insists, however, that it was not required to assign her to an open daytime position -- either as a promotion or as a demotion -- where she was not the best qualified person among those who had applied for the job.

For her part, Heisler has moved for partial summary judgment on four elements of her disability discrimination claims. She asks the Court to rule as a matter of law that (1) she is a "qualified individual with a disability," as defined by the federal and state statutes; (2) the Met Council did not take part in an interactive process related to accommodation; (3) the Met Council failed to accommodate her when it refused to reassign her to the open Associate Transit Operations Analyst position; and (4) the Met Council cannot establish "undue hardship" that would excuse the failure to reassign her.

The Court begins with the threshold issue on which the parties have directly squared off in their cross-motions: whether Heisler is a "qualified individual with a disability."

**"Qualified Individual With a Disability"**

The ADA defines a "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The EEOC has promulgated regulations to aid in interpreting and applying the three main components of the term "disability": "physical or mental impairment," "substantially limits," and "major life activities." See Sutton v. United Airlines, Inc., 527 U.S. 471, 479-80 (1999) (discussing 29 C.F.R. § 1630.2(h)-(j)). The

regulations state that a "mental impairment" includes "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). The EEOC regulations construe the phrase "substantially limits" to mean that the person is

> (i) unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added). Lastly, the regulations state that "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Heisler argues that she satisfies the ADA's definition of "disability" because she either (1) has a mental impairment that substantially limits a major life activity, or (2) has a record of having such an impairment. (Pl.'s Response to Def.'s Mot. for Partial Summ. J. at 18.) The Court considers each alternative in turn.

**1. A mental impairment that substantially limits one or more major life activities.**

Heisler has been diagnosed as suffering from a major depressive disorder and seasonal affective disorder. (See Heisler Dep. at 58; VPP Tr. at 230; Pl.'s Ex. 3.) She has

suffered from depression for approximately twenty years. (Heisler Dep. at 233-34.) For the last few years, Heisler has taken medication to treat her depression; nevertheless, her symptoms have continued. (Heisler Dep. at 53-54.) She continues to undergo psychotherapy approximately twice a month. (Id. at 52-53, 55.) During a period of hospitalization in July 1999, Heisler also underwent electro-shock therapy treatments; they did not, however, provide long-term help for her depression. (Id. at 219.)

There appears to be no dispute that Heisler's depression constitutes a "mental impairment." The Met Council challenges, however, whether that impairment rises to the level of a disability; that is, whether Heisler's depression substantially limits a major life activity. Heisler has testified that her depression has made it hard for her "to do everyday tasks; it is hard to get out of bed; it is too much energy to wash the dishes or do laundry or even talk on the phone; feelings of great sadness and isolating myself and not talking to anybody or calling anybody."[13] (Heisler Dep. at 58.) She has further indicated that her depression has made it "hard to perform manual tasks, everyday tasks like taking the garbage out and sweeping the floor, daily hygiene, lack of concentration, I've taken time off from work, isolation, and just having suicidal thoughts and extreme sadness and the

---

[13] Heisler testified that her doctors would not allow her to work past 4:00 or 5:00 p.m. because working the evening and night shifts exacerbated her feelings of isolation: "[M]y social network is completely – is non-existent strictly because I work nights, and am not available during the day and evening hours." (Heisler Dep. at 122-23.) When Heisler's restricted work hours were accommodated, Heisler's social network changed in that she saw more people than she used to and was more connected. (Id. at 123.)

inability just to function."[14] (VPP Tr. at 230.) In her memorandum opposing summary judgment, Heisler has highlighted four major life activities in which she claims to be substantially limited by the major depressive disorder: taking care of herself; concentration; interacting with others; and sleeping.[15] (Pl.'s Mem. Response to Def.'s Mot. for Summ. J. at 15-16.)

Heisler has not come forward with evidence from which a jury could find that she is wholly unable to concentrate, interact with others, take care of herself, or sleep. Rather, she alleges that her depression makes those tasks "hard." To the extent Heisler contends that it is difficult for her to do certain everyday tasks (such as take out the garbage or do laundry) or to care for herself, her testimony is both subjective and conclusory. From it, a finder of fact cannot evaluate the condition, manner, or duration under which Heisler can perform such tasks relative to an average person, let alone conclude that Heisler is significantly limited in performing such tasks as compared to an

---

[14] When specifically asked whether problems with depression or seasonal affective disorder affected Heisler in her ability to do her job, she responded that it affected her concentration level: "If I had a task to do, it would take me twice as long to do it or just having problems making decisions, even the smallest of ones to do." (Id. at 61.) She also indicated that it affected her ability to communicate with her other supervisors – she would not contact them or be in touch with them. (Id.)

[15] The Met Council argues that the only major life activity Heisler identified in her deposition was a need to socialize. The Court finds this argument to be a mis-characterization of Heisler's deposition testimony. Heisler testified that working the 4:30 p.m. to 2:30 a.m. shift had a negative impact on her ability to socialize with others which, in turn, exacerbated the feelings of isolation that she has experienced in connection with her depression.

average person. Similarly, the evidence regarding Heisler's capacity for concentration or her ability to interact with others, quoted above, does not reasonably support an inference that she is significantly limited as compared to an average person in the general population with respect to those activities. In fact, there is ample evidence that, in the workplace environment, Heisler is very competent at performing her job – a job that requires both concentration and interaction with others.

As for Heisler's problems with sleeping, the record reflects that Heisler suffers from sleep apnea -- a sleep disorder in which the patient stops breathing. (See Heisler Dep. at 238.) Contrary to the assertions of Plaintiff's counsel at oral argument, that sleep disorder is separate and distinct from her depression. (See Pl.'s Ex. 24 (Mar. 19, 1998 Medical Record Entry by Dr. Ware).) Heisler has not established a causal link between the mental impairment she asserts as a disability – a major depressive disorder – and the difficulties she experiences in sleeping. Furthermore, it appears that Heisler has been receiving treatment for her sleep disorder (e.g., the use of a positive air pressure machine for sleep apnea). (See Heisler Dep. at 238; Pl.'s Ex. 24 at Bates No. MET 2460.) "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures--both positive and negative--must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act. Sutton, 527 U.S. at 482. The record contains no evidence regarding the effects (positive or negative) of the mitigating measures Heisler is

employing for her sleep disorder. Therefore, the Court cannot evaluate whether Heisler's ability to sleep is "substantially limited" relative to the average person.

Finally, even if a jury could find that Heisler's depression significantly limited her in one or more major life activities, there is no evidence that such limitations are either permanent or long-term. Among the factors the EEOC has identified as relevant to evaluating whether a person is "substantially limited" in a major life activity is "the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(iii); see also Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997) ("Statutory disability requires permanent or long-term limitations."). Heisler has testified that "the major depression issues . . . [are] not all the time, it is just there are stints of time when it is worse, and then it gets a little better and then it just gets worse again, so it is kind of constant, it is just the degree." (Heisler Dep. at 59.) Having reviewed the deposition testimony and documentation presented on summary judgment, it appears that there is insufficient evidence to allow a reasonable jury to find that Heisler is substantially limited in a major life activity.

**2. A record of a disability**

Heisler alternatively argues that she has a "disability" under the ADA and MHRA because she has "a record of" an impairment that substantially limits one or more major life activities. To support this argument, Heisler cites School Board of Nassau County, Fla. v. Arline, 480 U.S. 273 (1987). Arline was a Rehabilitation Act case in which the

plaintiff, an elementary school teacher, argued that she had "a record of impairment" and was therefore "handicapped" because she had been hospitalized for tuberculosis approximately twenty years before her termination. See Arline, 480 U.S. at 281. The Supreme Court stated that the tuberculosis "was serious enough to require hospitalization, a fact more than sufficient to establish that one or more of her major life activities were substantially limited." Id. On this language Heisler relies.

The Eighth Circuit has rejected a broad reading of Arline, such as that proposed by Heisler, holding that simply being hospitalized is not sufficient to establish "a record of" an impairment that rises to the level of a "disability." Gutridge v. Clure, 153 F.3d 898, 901 (8th Cir. 1998), cert denied sub nom., Gutridge v. Midland Computer, Inc., 526 U.S. 1113 (1999); see also Demming v. Housing & Redevelopment Auth. of Duluth, Minn., 66 F.3d 950, 955 (8th Cir. 1995) (reaching similar conclusion under Rehabilitation Act). "Such an interpretation would establish the 'nonsensical proposition that any hospital stay is sufficient to evidence a "record of impairment."'" Gutridge, 153 F.3d at 901 (quoting Taylor v. United States Postal Serv., 946 F.2d 1214, 1217 (6th Cir. 1991)). Rather, the Eighth Circuit has held that, "[i]n order to have a record of disability under the ADA, a plaintiff's medical documentation must show that [s]he has a history of, or has been misclassified as having, a physical or mental impairment that substantially limits one or more major life activities." Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999), cert. denied, 120 S. Ct. 794 (2000); see also Taylor v. Nimock's Oil Co., 214 F.3d 957,

961 (8th Cir. 2000). Furthermore, a "[s]tatutory disability requires permanent or long-term limitations." Heintzelman, 120 F.3d at 145; see also 29 C.F.R. app. § 1630.2(j) (providing that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.")

Heisler has identified three items of admissible medical documentation that constitute her "record of a disability."[16] The first item is a March 5, 1999 Metro Transit (Dis)Ability Status Report, signed by Dr. Klemm, stating that Heisler had become disabled due to a major depressive disorder on January 14 and that the course of treatment included hospitalization, partial hospitalization, and medication management. (Pl.'s Responsive Ex. 3.) The second is a selection of eight pages from Heisler's medical records covering a time period from between February 5, 1998 and July 8, 1999.[17] (Pl.'s Responsive Ex. 24.) The third item is a set of three "Certification of Health Care Provider" forms signed by Heisler's doctors in connection with her applications for FMLA leave. (Pl.'s Responsive Ex. 26.) The forms are dated October 31, 1996, January 20, 1999, and June 21, 1999.

---

[16] Heisler also placed into evidence two physician letters, written by her doctors to her attorney, that are dated more than one year after Heisler's termination. (Pl.'s Exs. 33 & 34.) The statements contained in these documents are inadmissible hearsay and, therefore, cannot be relied upon to resist a motion for summary judgment.

[17] The eight pages fall within a Bates range starting at MET 2445 and ending at MET 2478. Thus, these do not appear to be the complete medical records for Heisler that were produced in discovery.

Having carefully reviewed Heisler's medical records, the Court concludes that a reasonable jury could not find that Heisler was substantially limited, on either a permanent or long-term basis, with respect to one or more major life activities due to her depression. That is, the medical records do not establish a history, with respect to any major life activity, of Heisler being "significantly limited in the condition, manner, or duration under which [she could] perform that activity as compared to an average person in the general population." Webner, 267 F.3d at 834. Heisler's reports of decreased concentration, decreased motivation, decreased interest, increased fatigue, and difficulty "thinking straight" appear to be episodic rather than chronic. As Heisler herself testified, "the major depression issues . . . [are] not all the time, it is just there are stints of time when it is worse, and then it gets a little better and then it just gets worse again, so it is kind of constant, it is just the degree." (Id. at 59.) Based on the foregoing, the Court concludes that Heisler has failed to give rise to a genuine issue of material fact as to whether she has a "record of disability."

### 3. Conclusion

Heisler has failed to present sufficient evidence to establish that the nature, duration, and long-term impact of her depression caused her to be substantially limited in a major life activity. Heisler has also failed to present sufficient evidence to establish a record of a disability. Heisler therefore fails to satisfy the statutory definition of "qualified individual with a disability" under either the ADA or the MHRA. The Court

concludes that the Metropolitan Council is entitled to summary judgment on Heisler's claims of disability discrimination.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT**

1. Defendant's Motion for Summary Judgment (Doc. No. 26) is **GRANTED**;

2. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 21) is **DENIED**; and

3. The Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 14, 2001

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*